UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

In re:                                    )        Case No. 16bk05364
                                          )
Bluberi Gaming Technologies, Inc., *et al.*,[1]   )        Chapter 15
                                          )
      Debtors in a Foreign Proceeding.    )        Judge Timothy A. Barnes
                                          )

TIMOTHY A. BARNES, Judge.

### MEMORANDUM DECISION[2]

   This matter comes on for consideration on AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 60] (the "Motion"), brought by AGS LLC ("AGS"). Upon a review of the parties' respective filings and after holding hearings on the matter, for the reasons more fully stated below, the court finds that AGS has failed to establish a contractual right to the performance it seeks under 11 U.S.C. § 365(n)(4), and the Motion must, therefore, be denied.

### JURISDICTION

   The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"). 28 U.S.C. § 1334(a). The federal district courts also have "original but not exclusive jurisdiction" of all civil proceedings arising under title 11 of the United States Code, or arising in or related to cases under title 11. 28 U.S.C. § 1334(b). District courts may, however, refer these cases to the bankruptcy judges for their districts. 28 U.S.C. § 157(a). In accordance with section 157(a), the District Court for the Northern District of Illinois has referred all of its bankruptcy cases to the Bankruptcy Court for the Northern District of Illinois. N.D. Ill. Internal Operating Procedure 15(a).

   A bankruptcy judge to whom a case has been referred may enter final judgment on any core proceeding arising under the Bankruptcy Code or arising in a case under title 11. 28 U.S.C. § 157(b)(1). Bankruptcy judges must therefore determine, on motion or *sua sponte*, whether a proceeding is a core proceeding or is otherwise related to a case under the Bankruptcy Code. 28 U.S.C. § 157(b)(3). As to the former, the court may hear and determine such matters. 28 U.S.C.

---

[1]      The debtors in this chapter 15 case and the last four digits of each debtor's U.S. tax identification number are as follows: Bluberi Gaming Technologies Inc. (9150), Bluberi Group Inc. (5089) and Bluberi USA, Inc. (7934). The debtors' headquarters are located at 310-2120 Rue Letendre, Drummondville, Québec J2C 7E9 Canada. Bluberi USA, Inc. maintains a post office box located at 2711 Centerville Road, Suite 400, Wilmington, Delaware 19808.

[2]      This Memorandum Decision restates and, to the extent it differs, supersedes the court's oral ruling made on May 31, 2016.

§ 157(b)(1). As to the latter, the bankruptcy court may hear the matters, but may not decide them without the consent of the parties. 28 U.S.C. §§ 157(b)(1), 157(c); *In re Radco Merch. Servs., Inc.*, 111 B.R. 684, 686 (N.D. Ill. 1990). Instead, the bankruptcy court must "submit proposed findings of fact and conclusions of law to the district court, and any final order or judgment shall be entered by the district judge after considering the bankruptcy judge's proposed findings and conclusions and after reviewing *de novo* those matters to which any party has timely and specifically objected." 28 U.S.C. § 157(c)(1).

The scope of what is or is not a core proceeding when arising in a chapter 15 case is unsettled. Recognition of foreign proceedings and other matters under chapter 15 of the Bankruptcy Code are expressly core proceedings. 28 U.S.C. § 157(b)(2)(P). At least one court has held, however, that the "other matters" language from this section is not outcome determinative. *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 676 (S.D.N.Y. 2011) ("that 'recognition of foreign proceedings and other matters under chapter 15 of title 11' are core proceedings is not relevant" to a determination of whether such "other matters" are in fact core proceedings). Put another way, the "other matters" catchall operates in much the same way as section 105 of the Bankruptcy Code – it helps fill in the gaps but does not allow the court to act where it clearly should not. *See, e.g., Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted."); *Levit v. Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1197-98 (7th Cir. 1989) (same).

Each party has voluntarily submitted itself to this court's jurisdiction (the debtors and the Foreign Representative, as defined below, by petitioning for chapter 15 relief and AGS by bringing the Motion) or has impliedly consented to this court's jurisdiction, and thus the court may statutorily hear and determine the matters as core matters. *Radco Merch. Servs., Inc.*, 111 B.R. at 686. In addition, because the matter at bar arises out of an earlier order of the court that neither party challenged jurisdictionally, the court must treat the enforcement of the order as validly within its statutory jurisdiction. *Id.* at 688.

That does not, however, answer the question of whether the court may constitutionally hear and determine the matters, but that is an inquiry better taken up once informed by the history of this matter.

## HISTORY

These chapter 15 cases were commenced on February 18, 2016 by Bluberi Gaming Technologies Inc. ("Bluberi Gaming"), Bluberi Group Inc. and Bluberi USA, Inc. (collectively, "Bluberi").

Bluberi's Petitions and Verified Petitions [Dkt. Nos. 1, 2] (the "Petitions") and the other documents filed in support thereof, state the case for Bluberi's need for chapter 15 recognition and relief. Bluberi is, as is set forth in those documents, a Canadian company conducting business both in the United States and in Canada. That business is, at its essence, the development, sale and deployment of electronic gaming machines. Bluberi's customers are principally casinos in the United States, including casinos located in Native American lands, but also exist elsewhere throughout the Americas.

Aside from its direct revenues, Bluberi appears to have financed its operations and recent growth in two ways, from direct borrowing from Callidus Corporation ("Callidus"), Bluberi's largest creditor, and through the sale of interests in electronic gaming equipment and licensing of its proprietary software to AGS. With those funds, Bluberi expanded its business operations to include a wider range of services in the gaming industry.

Those expanded operations have not yet generated sufficient revenue to pay the obligations incurred by Bluberi. As a result, on November 15, 2015, Bluberi commenced an insolvency proceeding under Canada's Companies' Creditors Arrangement Act (R.S.C. 1985, c. C-36) (the "CCAA"), pending before the Superior Court – Commercial Division, Province of Québec, District of Montréal (the "Canadian Court"), File No. 500-11-049737-154 (the "Canadian Proceeding"). The Petitions indicate that this case was commenced in support of the Canadian Proceeding.

Early in the Canadian Proceeding, Mr. Justice Jean-François Michaud of the Canadian Court appointed Ernst & Young Inc. as monitor and Joe Pernica of Pernica Advisory Services Inc. as Bluberi's Chief Restructuring Officer. At a subsequent hearing, Mr. Justice Michaud also authorized Bluberi Gaming to act as foreign representative for itself and the rest of Bluberi.[3] Later still, the Canadian Court approved a sale of substantially all of Bluberi's assets to Callidus. That sale, however, has not yet closed.

In support of and in preparation for the sale, the Foreign Representative commenced the above-captioned chapter 15 cases, seeking an order granting recognition of the Canadian Proceedings under 11 U.S.C. § 1517.[4] Prior to the hearing on recognition of the Canadian Proceedings (the "Recognition Hearing"), the Foreign Representative sought, on an emergency basis, interim relief under 11 U.S.C. § 1519. In that request, the Foreign Representative asked that the court order the projections of 11 U.S.C. § 363(e) – the so-called "*ipso facto*" contract termination prohibitions – on an interim basis in the case. The court conducted a hearing on the emergency motion on February 22, 2016. At the hearing, the court questioned the propriety of selectively applying provisions of the Bankruptcy Code in chapter 15 cases.[5] Such a practice ignores the checks and balances elsewhere in the system that may have bearing on the provisions being applied as a whole. Selectively applying the substantive law of a nonmain jurisdiction upsets the equilibrium otherwise established in that domestic substantive law.

---

[3]     Bluberi Gaming is therefore also referred to herein as the "Foreign Representative."

[4]     After the Congress enacted the Bankruptcy Abuse Prevention and Credit Protection Act of 2005, thereby substantially codifying the United Nations Commission on International Trade Law (UNCITRAL)'s Model Law on Cross Border Insolvency as chapter 15 of the Bankruptcy Code (the "Model Law"), there is no longer a route to comity in the United States of foreign insolvency proceeding except through chapter 15 recognition. *See* 11 U.S.C. § 1509(c) (any request for comity from a court in the United States must be accompanied by a chapter 15 recognition order); *In re Millard*, 501 B.R. 644, 653 (Bankr. S.D.N.Y. 2013) ("recognition is a *sine qua non* for access to the U.S. courts"); *Oak Point Partners Inc. v. Lessing*, Case No. 11-CV-03328-LHK, 2013 WL 1703382, at *6 (N.D. Cal. Apr. 19, 2013) (same); *see also* Timothy A. Barnes, *Race to the Courthouse–BAPCPA May Spur International Forum Shopping, in* J. CORP. RECOVERY (2006).

[5]     In fact, the parsed application of section 365 has been expressly disapproved. *Jaffe v. Samsung Elecs. Co.*, 737 F.3d 14, 29 (4th Cir. 2013) (approving the bankruptcy court's refusal under section 1522 to apply all of section 365 except for section 365(n) in a chapter 15 case) (referred to herein as "*Qimonda*," the name of the underlying debtor in foreign proceeding).

In the absence of an objection, however, though admittedly on very shortened notice for any such objection to be lodged, the court ordered the relief requested. *See* Provisional Order under Chapter 15 [Dkt. No. 38] (the "Provisional Order"). In the Provisional Order, the court found that the *ipso facto* protections in section 363(e) were consistent with the protections afforded by the automatic stay under 11 U.S.C. § 362(a), which would automatically apply in the case upon recognition under 11 U.S.C. § 1520(a)(1) and was also provisionally applied under the Provisional Order. By separate order, the court also scheduled the Recognition Hearing for March 15, 2016 and set notice requirements and objection deadlines relating thereto. For the order sought in the Recognition Hearing, the Foreign Representative asked that not just the preceding protections, but that section 365 in its entirety, be applied upon recognition under 11 U.S.C. §§ 1520(a)(1) & 1521.

Prior to the Recognition Hearing, AGS objected to the Provisional Order and the relief requested upon recognition. *See* AGS LLC's Response to Verified Petitions of Canadian Proceeding under Chapter 15 and Motion for Order Granting Related Relief, and Provisional Order under Chapter 15 [Dkt. No. 42] (the "Recognition Objection").[6] In the Recognition Objection, AGS argued that the chapter 15 cases should not be permitted to interfere with the retrieval of source code held in escrow between AGS and Bluberi. AGS did not, however, object to the recognition of the Canadian Proceedings itself, nor the application of section 365 upon recognition.

At the Recognition Hearing, the court agreed with the Foreign Representative's position that the Recognition Objection was not an impediment to recognition, *see, e.g., AJW Offshore Ltd.*, 488 B.R. 551, 558-59 (Bankr. E.D.N.Y. 2013) (rejecting the contention that relief in section 1521 should be limited to the enumerated relief), and that the issues raised in the Recognition Objection were, in essence, a contractual dispute that was more appropriately raised in another fashion. As a result, and given that the Foreign Representative had established the predicates for recognition under 11 U.S.C. § 1517, on March 15, 2016, the court granted recognition of the Canadian Proceeding. *See* Final Order Granting Recognition of Canadian Proceeding under Chapter 15 and Related Relief [Dkt. No. 57] (the "Recognition Order"). Paragraph 5 of the Recognition Order made section 365 of the Bankruptcy Code applicable in this chapter 15 case, thus setting up circumstances akin to those in *Qimonda*.

It took almost no time at all, however, for AGS to renew the contractual dispute. On March 18, 2016, only three days later, AGS filed the Motion and supporting documents, in total more than 300 pages' worth. The length of those filings has been the norm in this matter. In its bid to have the Motion approved, AGS has inundated the court with documents; more than 1,000 pages in total.

In considering the Motion, the court has considered the arguments of the parties at the April 19, 2016 and May 31, 2016 hearings on the Motion, and has considered the following filed documents in the chapter 15 case:

(1)    Declaration of Richard F. Holley, Esq. in Support of AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 61] (the "Holley Decl.");

---

[6]    Filed in conjunction with the Recognition Objection but also relied on for the matters at bar is the Omnibus Declaration of Victor Gallo [Dkt. No. 44] (the "Gallo Decl.").

(2)    Callidus Capital Corporation's Objection to Motion to Compel Performance of Bluberi Gaming Technologies Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 68];

(3)    Bluberi's Objection to Motion to Compel Performance of Bluberi Gaming Technologies Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 69, refiled at Dkt. No. 76];

(4)    Declaration of Gérald Duhamel in Support of Bluberi's Objection to AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies Inc. [Dkt. No. 70];

(5)    Declaration of Geoffrey Miller in Support of Bluberi's Objection to AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies Inc. [Dkt. No. 71];

(6)    AGS LLC's Omnibus Reply to Callidus Capital Corporation's Objection to AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies, Inc. Pursuant to 11 U.S.C. § 365(n)(4) and to Bluberi's Objection to AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies Inc. [Dkt. No. 77];

(7)    Second Supplemental Declaration of Victor Gallo [Dkt. No. 78] (the "Supp. Gallo Decl.");

(8)    Affidavit of Scott Melnick [Dkt. No. 79];

(9)    Supplemental Declaration of Richard F. Holley, Esq. [Dkt. No. 80];

(10)    Application to Set Hearing on Emergency Hearing [Dkt. No. 85];

(11)    Emergency Motion for (I) An Order Authorizing Bluberi Gaming Technologies Inc. to File a Surreply and Responding Declarations to AGS LLC's Omnibus Reply in Support of Its Motion to Compel and (II) Request for Evidentiary Hearing [Dkt. No. 88];

(12)    AGS LLC's Objection to Emergency Motion for (I) An Order Authorizing Bluberi Gaming Technologies Inc. to File a Surreply and Responding Declarations to AGS LLC's Omnibus Reply in Support of Its Motion to Compel and (II) Request for Evidentiary Hearing [Dkt. No. 92];

(13)    Notice of Filing of AGS LLC's Previously Sealed Exhibits 1-8 [Dkt. No. 100] ("AGS LLC's Exhibits");

(14)    AGS LLC's Motion for Leave to File Supplement to AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies, Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 101];

(15)    Bluberi's Response to AGS LLC's Motion for Leave to File Supplement to AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 102];

(16)    AGS LLC's Reply in Support of Its Motion for Leave to File Supplement to AGS LLC's Motion to Compel Performance of Bluberi Gaming Technologies, Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 103]; and

(17)   Callidus Capital Corporation's Joinder in Bluberi's Response to AGS LLC's Motion for
Leave to File Supplement to AGS LLC's Motion to Compel Performance of Bluberi
Gaming Technologies Inc. Pursuant to 11 U.S.C. § 365(n)(4) [Dkt. No. 104].

The court has also taken into consideration any and all exhibits submitted in conjunction
with the foregoing. Though these items do not constitute an exhaustive list of the filings in the
above-captioned bankruptcy case, the court has taken judicial notice of the contents of the docket in
this matter. *See Levine v. Egidi*, Case No. 93C188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993)
(authorizing a bankruptcy court to take judicial notice of its own docket); *In re Brent*, 458 B.R. 444,
455 n.5 (Bankr. N.D. Ill. 1989) (Goldgar, J.) (recognizing same). In addition, the court has taken
into account the history of this chapter 15 case generally.

## CONSTITUTIONAL AUTHORITY

As noted above, this court, as a court empowered to act by Congress under Article 1 of the
United States Constitution, is also charged with determining its constitutional authority, a task that
has gotten considerably more difficult since the United States Supreme Court relatively recently
rejected as unconstitutional the statutory framework for bankruptcy courts. *See Stern v. Marshall*, 564
U.S. 462 (2011). In *Stern*, the Supreme Court for the second time invalidated the underpinnings of
the bankruptcy courts, opining largely without regard to the fact that offending provisions found
their origins in the emergency rule adopted by the Judicial Conference of the United States in the
wake of the Supreme Court's earlier invalidation of the statute in *Northern Pipeline Constr. Co. v.
Marathon Pipe Line Co.*, 458 U.S. 50, 53 (1982); *see also* L. Levit and R. Mason, *Where Do We Go from
Here? Bankruptcy Administration Post-Marathon*, 87 COMM. L.J. 353, 354 (1982); K. Klee, *Legislative
History of the New Bankruptcy Law*, 28 DEPAUL L. REV. 941 (1979).

Notwithstanding the irony of the *Stern* ruling, it governs this court's consideration of the
matter at bar. Though none of the parties have challenged this court's constitutional authority, the
court must independently consider whether such authority exists. *See, e.g., Tech. Automation Servs.
Corp. v. Liberty Surplus Ins. Corp.*, 673 F.3d 399, 401 (5th Cir. 2012); *In re Thompson*, 520 B.R. 731, 733
(Bankr. E.D. Wis. 2014).

The challenge of such an inquiry is that it quickly falls prey to concerns parallel to those
noted above with respect to jurisdiction. *Fairfield Sentry Ltd. Litig.*, 458 B.R. at 676-686. In *Fairfield
Sentry*, the court conducted an extensive inquiry into the jurisdiction afforded a bankruptcy court
under the catchall provision of 28 U.S.C. § 157(b)(2)(P), combined secondarily with the catchall
provision in section 1521(a)(7) of the Bankruptcy Code, and concluded that absent another basis for
jurisdiction, these provisions were insufficient to confer jurisdiction. *Id.* In so doing, the court also
considered whether the adjudication of specific claims at issue there, arguably within the court's
jurisdiction under these provisions, would violate the principles set forth in *Stern*, concluding that it
would. *Id.* at 687-88.

Here, there is little question that determinations under section 365 in a plenary case are
within the court's constitutional authority. *In re Stamp Farms, L.L.C.*, No. ADV 13-80184, 2014 WL
1017041, at *5 (Bankr. W.D. Mich. Mar. 13, 2014) ("[B]ecause § 365 is closely-linked to the claims
allowance process (at least for claims arising from executory contracts and unexpired leases), the
proceeding to this extent is a continuation of the 'core' claims proceeding ..., a proceeding in which
the court's authority is at its 'constitutional maximum.'").

In this jurisdiction, it has previously been considered whether an interpretation of contract rights under section 365(n) ventured too far into territory reserved for the Article III courts under the Constitution. *In re Lakewood Eng'g & Mfg. Co., Inc.*, 459 B.R. 306, 310-12 (Bankr. N.D. Ill. 2011) (Hollis, J.), *aff'd sub nom. Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC*, 686 F.3d 372 (7th Cir. 2012). In *Lakewood*, the nondebtor party sought to withdraw the reference for this reason, but the District Court declined to hear the matter, reasoning that the matter might be resolved simply by determining the operation of the Bankruptcy Code. *Id.* at 311-12.

Hearing the matter, Judge Hollis concluded that was indeed the case, reasoning that:

> In the course of this Memorandum Opinion, this court interprets a contract under principles described in Illinois law, and then determines the effect of rejection of that contract under bankruptcy law. Rejection of a contract and the effects thereof are creations purely of bankruptcy law. This action clearly "stems from the bankruptcy itself."

*Id.* at 312. It is difficult to fault that logic. As in *Lakewood*, this court's ultimate determination is one of bankruptcy law … whether or not to order relief under section 365(n)(4) of the Bankruptcy Code.

But this is not a plenary case and section 365 does not automatically apply in chapter 15 cases upon their recognition. *See* 11 U.S.C. § 1520 (relief automatically applicable on recognition). Instead, section 365 only applies in this matter pursuant to the terms of this court's Recognition Order. *See* Recognition Order, ¶ 5 ("Section 365 of the Bankruptcy Code shall apply in these chapter 15 cases pursuant to section 1521(a)(7) of the Bankruptcy Code."); *see also* 11 U.S.C. § 1521(a)(7) (affording the court authority to grant upon recognition any additional relief that may be available to a trustee).

As a result, the concerns set forth in *Fairfield Sentry* continue to be in play. As the court therein noted, it cannot be the case that any authority made applicable to a chapter 15 case through section 1521(a)(7) falls within this court's constitutional authority. If that were the case, a recognition order could bootstrap this court into the territory of the Article III courts, and this court could confer upon itself by so doing the authority to hear and determine almost any matter in a chapter 15 case. There must be an independent source of that authority.

It appears to the court that there are two independent sources of constitutional authority here. First, stemming from the fact that the inquiry in question is, even though grafted on these proceedings by way of section 1521(a)(7), an inquiry arising nowhere but in a bankruptcy case. Second, stemming from the fact that the parties have consented to this court's authority.

As to the first, as noted in *Lakewood*, an inquiry under section 365(n) is purely a bankruptcy cause of action. *Lakewood Eng'g & Mfg*, 459 B.R. at 312. While such an inquiry requires the bankruptcy court to interpret state law rights, the ultimate inquiry is not a state law matter, nor does the fact that the matter turns on state law have bearing. What matters is the cause of action itself. Here, this is not "the stuff of the traditional actions at common law tried by the courts at Westminster in 1789." *Northern Pipeline*, 458 U.S. at 90 (Rehnquist, J., concurring in judgment). As such, hearing and determining this matter does not run afoul of the proscriptions in *Stern*.

7

As to the second, both the Supreme Court and the Seventh Circuit Court of Appeals have recently clarified what the consent of parties does to this analysis. The question specifically is this – can the consent of parties confer upon a bankruptcy court constitutional authority where none otherwise exists? Previously, in a nonbankruptcy context, the Supreme Court had answered "no" to that question. *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) ("[T]he parties cannot by consent cure the constitutional difficulty for the same reason that the parties by consent cannot confer on federal courts subject-matter jurisdiction beyond the limitations imposed by Article III, § 2."). Adding further complexity to the patchwork of law in this arena, the Supreme Court, however, has found that bankruptcy courts may in fact hear and determine such matters by consent. *Wellness Int'l Network, Ltd. v. Sharif*, --- U.S. ---, 135 S. Ct. 1932, 1949 (2015) ("The Court holds that Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent."). And even more recently, the Seventh Circuit has clarified that such consent need not be express, but can be implied. *Richer v. Morehead*, 798 F.3d 487, 490 (7th Cir. 2015) ("The parties' consent was implicit, but implied consent is good enough ….") (*citing Wellness Int'l Network*, 135 S. Ct. at 1948 ("nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express")).

Here, none of the parties have accepted the court's invitation to brace the issue of this court's constitutional authority, but instead have encouraged the court to rule. As such, even if the matter were not within the court's constitutional authority stemming from the first source, it is so as a result of the second. This court has constitutional authority to hear and determine this matter.

## DISCUSSION

Aside from the fact that it arises in a chapter 15 case, the matter before the court is not at its essence a unique one.[7] At its heart, this is purely a dispute over how to interpret and apply a poorly drafted series of contracts. Such a resolution falls squarely within the core competency of the bankruptcy courts, and, at least insofar as the poorly drafted part goes, occurs all too often.

Contract interpretation is at the heart of this matter. Not only is it crucial in the determination of whether the matter in question is properly before the court, but it should come as no surprise that it is just as crucial in the ultimate resolution of the matter. For that reason, the court will begin with a brief analysis of the contracts in question here, as well as the nature of the dispute arising out of them. Following that, the court then considers whether the dispute properly qualifies for consideration under section 365(n)(4). Last, the court considers what result the application of 365(n)(4) to these facts dictates.

## A.  The Bluberi/AGS Contracts

As noted above, Bluberi has financed its recent operations and growth, in part, through the sale of interests in electronic gaming equipment and licensing of its proprietary software to AGS. Prior to entering into the current contracts, it appears that AGS acted for Bluberi under a

---

[7]    This is not meant to imply that this case is unique by virtue of being a chapter 15 case in this jurisdiction. While the bulk of chapter 15 cases is filed in New York and Delaware, this jurisdiction has had and continues to have its share of these cases. There is, however, to date no published law on chapter 15 arising from this jurisdiction, which has required the court to look to other courts on some of the salient issues.

distribution agreement. On January 9, 2012, the parties modified that relationship by entering into an agreement with the stated purpose of granting AGS "a perpetual, fully paid-up license to use … the Bluberi gaming software" then being operated by AGS. <u>AGS LLC's Exhibits</u>, Ex. 1 (the "<u>Definitive Agreement</u>").

Section 14 of the Definitive Agreement is a provision for the treatment of Bluberi's software. In particular, Section 14 requires Bluberi to place the source code for the subject gaming software into escrow, and provides for conditions under which AGS may access that software. <u>Id.</u> at 14.1-14.3. The point behind the escrow provisions appears to be to preserve Bluberi's right of ownership in the source code.[8] For example, Section 14: (i) limits access to repair rights, <i>id.</i> at

<hr>

[8]      Parties use software escrows for source code precisely for this reason, to protect the rights of the licensor. B. Freedman, "A Practical Guide to Software License Agreements: Source Code Escrow Arrangements," <i>http://www.blg.com/en/newsandpublications/publication_3550</i> (last visited July 19, 2016). This article points out the essential difference between source code (the original software, as written) and object code (the compiled, executable version of the software) and how software escrows protect licensors by protecting the source code. In part, it states:

> Software vendors usually provide customers with copies of licensed software in
> object code version only. There are numerous reasons for this approach, including:
> (1) source code is valuable intellectual property, and unauthorized use or disclosure of source
> code can cause significant loss or irreparable harm to the vendor; and (2) customers that do
> not have access to source code are more likely to purchase software maintenance and other
> services from the vendor.

<i>Id.</i> Neither party here has directed the court to case law to assist it in interpreting the contracts within the context of the industry. The court has searched, and found only two cases remotely on point.

In <i>Peter Kiewit Sons' Inc. v. Atser, LP</i>, Case No. 8:08CV541, 2010 WL 1609679, at *5 (D. Neb. Apr. 16, 2010), the court struggled with an issue similar but slightly different than that posed here. That structure also involved a "nonexclusive, nontransferable fully paid up and perpetual single server license to use object code." <i>Id.</i> at *1. In support of that license, the parties agreed to use a source code escrow, but left the terms of that escrow to be agreed upon in the future. <i>Id.</i> at *2. The parties also agreed to a service agreement of limited duration. <i>Id.</i> The escrow in question was, however, never implemented. This was because the term of the software escrow – left to be determined later – could not be agreed upon. <i>Id.</i> at *2-3. Atser, the licensor, contended that the escrow should exist for the term of the service agreement only, while Peter Kiewit Sons', the licensee, contended that the escrow should exist for the perpetual term of the license. <i>Id.</i> at *5. Further, the licensee contended that the licensor should be compelled to continue to service the license and allow access to the source code outside of the terms agreed to in the license. <i>Id.</i>

The court in <i>Peter Kiewit</i> clearly struggled with issues akin to those here. Even after conducting a trial, it noted that "[t]he evidence at trial revealed no trade custom or usage" with respect to the treatment of the escrow. <i>Id.</i> at *4. Despite the existence of a perpetual license and in light of there being no clear meeting of the minds of the parties, the court concluded that no factor existed under which the licensee could compel the licensor to escrow the software, allow uses not agreed to by the parties, or compel continued service of the software. The licensee's suit was dismissed with prejudice. <i>Id.</i> at *5.

In <i>BMS Computer Solutions Ltd. v. AB Agri Ltd.</i>, [2010] EWHC 464 (Ch), <i>available at</i> http://www.bailii.org/ew/cases/EWHC/Ch/2010/464.html (last visited July 20, 2016), The Rt. Hon. Lord Justice Sales of the High Court of Justice, Chancery Division, of England and Wales, considered what to do with an amended agreement to provide a "UK-wide perpetual licence" in light of unamended provisions of the original license that called for termination of the license upon termination of the support provisions related thereto. <i>Id.</i> at ¶¶ 11-19 (the UK spelling of license so in the original).

14.2(2)[9] & 14.3, but only where Bluberi has not performed and has not given an "agreeable explanation"; (ii) requires AGS to limit access to the source code to only those employees necessary to the repair, *id.* at 14.2; and (iii) places an obligation on AGS to execute an affidavit as to the nature of its access and including in that affidavit an affirmative statement that no copies of the source code were kept. *Id.* at 14.3; *see also id.* at 3.3 (prohibited activities). There are, of course, more permanent rights of retrieval to the software upon the termination of the Definitive Agreement.[10] The termination provisions contained in Section 16 are, however, not a model of clarity.[11]

       In support of the Definitive Agreement, the parties also executed: (a) a service agreement (the "<u>BSA</u>");[12] (b) an escrow agreement (the "<u>Escrow Agreement</u>");[13] and (c) an indemnity

---

While the issue in *BMS Computer Solutions* appears promisingly on point, as with the case at bar, the resolution of the matter turns more on the specific construction of and interplay between the original and amended licenses than with the true substantive interplay of perpetual licenses and service agreements. *Id.* In doing so, however, Mr. Justice Sales provides an interesting reading of how "'perpetual' can carry different shades of meaning. It can, for example, mean 'never ending' (in the sense of incapable of being brought to an end) or it can mean 'operating without limit of time' ... ." *Id.* at ¶ 17 (adopting the latter interpretation so as to conclude that the license is terminated).

       As with the *Peter Kiewit* case, *BMS Computer Solutions* stands for the proposition that the existence of a perpetual license does not require a more expansive reading of other contractual provisions. Together, both cases drive home the point that, as is the case here, the execution of the agreements governing the transaction can make or break the rights of the parties contained therein.

[9]       The copy of the Definitive Agreement provided to the court has two consecutive but different provisions labeled as 14.2. For this reason, the court refers to them as 14.2(1) and 14.2(2), respectively.

[10]       *See id.* at 16.3 (retrieve) & 14.4 ("Upon the retrieval ..., any and all obligations of Bluberi ... will automatically cease."). The Definitive Agreement uses three separate terms to describe the rights to remove the software from escrow: Retrieval, access and release. Retrieval appears to be used to reference the permanent removal of the software upon the termination of the Definitive Agreement, but also is used to imply something less. *See, e.g., id.* at 16.3 (retrieval upon termination); 14.4 ("Upon any retrieval ..., any and all obligations of Bluberi ... will automatically cease."). Access, on the other hand, appears to mean the temporary removal of software for repair. *See, e.g., id.* at 14.2(1) (joint access) & 14.2(2) (access by employees of AGS). Release and retrieval also appear at points to mean access. *Id.* at 14.2(2) & 14.3, respectively. Nowhere are the terms defined. Had they been, some of issues in dispute might have been more easily determined.

       For the point of clarity, the court will refer to retrieval as the ultimately, permanent removal of the software from escrow. Access will be used to cover instances other than retrieval.

[11]       Section 16.3 calls for retrieval of the software upon termination under "this section." As the larger divisions of the Definitive Agreement are referred to as sections, this reference to "section" would arguably allow AGS to retrieve the software upon Bluberi's termination for cause. *See id.* at 16.1 (allowing either party to terminate for the other party's regulatory noncompliance). More likely is that 16.3's retrieval provision was intended to apply only to termination under section 16.3, but, again, nowhere in the Definitive Agreement is the ambiguity over the use of the term "section" clarified. Further, even under the latter approach, 16.3(a) allows for a termination of the Definitive Agreement by AGS for a material breach by either party, again allowing for AGS to retrieve the software permanently even if it is the party in breach.

[12]       <u>Definitive Agreement</u>, Ex. D.

[13]       <u>Definitive Agreement</u>, Ex. I. The Escrow Agreement provided is that contemplated at the time of the execution of the Definitive Agreement and included as an exhibit thereto. The Escrow Agreement is executed by AGS and Bluberi, but is not executed by BNY Trust Company of Canada ("<u>BNY</u>") or, as was

agreement (the "Indemnity Agreement"),[14] among others. The BSA has subsequently been amended and extended several times by the parties.[15] Further project-based service agreements on a software specific basis executed by the parties were also provided.[16]

   While the Escrow Agreement is expressly referenced in the Definitive Agreement, the remaining agreements are not (though are, as noted above, attached as exhibits thereto). The Escrow Agreement also, in turn, references the Definitive Agreement and names BNY as the escrow agent. The Indemnity Agreement, on the other hand, was fully executed on January 29, 2012 – 20 days after the execution of the other documents provided. As executed, the Indemnity Agreement names BMM as agent. The Indemnity Agreement references the Definitive Agreement, though, as noted above, is not referenced therein and makes no provision for conflicts between the two.

   Though it is BMM's actions and the terms of the Indemnity Agreement upon which AGS's arguments, in part, lie, the documents themselves are unhelpful as to how the various agreements are to be read together. For example, though they clearly relate to the same subject matter (the software escrow) and were meant to coexist (each was an exhibit to the Definitive Agreement), no explanation has been given by either of the parties as to how the Escrow Agreement and the Indemnity Agreement should be balanced.[17] Each party has, at times, argued that the all agreements taken together should be read as a single, integrated contract. But as is discussed below, there are problems with this approach, not the least of which is this failure to explain the interaction of the agreements provided.

   Returning first to the issue at bar, it appears from the filings that AGS is seeking to access the software held by BMM. This access is not, though some unconvincing arguments to the contrary have been made, for the purpose of complying with the Definitive Agreement.[18] Instead,

---

evidently contemplated by the signature blocks thereto, by CIBC Mellon Trust Company, as agent. According to AGS, the escrow created thereunder is different than that referenced in the Indemnity Agreement. *See* Recognition Objection, ¶ 24.

[14]   AGS LLC's Exhibits, Exs. 7-8. Also included in its original, unexecuted form as Definitive Agreement, Ex. M. Neither party has explained how, if at all, the Indemnity Agreement changed between the form attached as an exhibit to the Definitive Agreement and that executed by BMM North America, Inc. ("BMM"), the agent named thereunder.

[15]   AGS LLC's Exhibits, Ex. 2.

[16]   *See* AGS LLC's Exhibits, Exs. 3-6.

[17]   While AGS has argued in another matter before the court that the Escrow Agreement should be held separate and apart, the use of an indemnification agreement to fill the role of an escrow agreement is unusual and not recommended, especially after the parties have shown that they are capable of drafting and understanding the application of an escrow agreement.

[18]   Though AGS appears, from its various demand requests to BMM, to have consistently asserted its rights solely under section 1.4 of the Indemnity Agreement, before the court AGS has subsequently retreated from arguments that Bluberi is not in compliance with the Definitive Agreement insofar as it is not responding in the contracted-for manner to issues arising in software maintenance, or in the alternative, has advanced that indiscriminate access is needed in order for the parties to comply with the circumstances already addressed in the bargained-for limited access in the Definitive Agreement. *See, e.g.,* Motion, ¶ 60; Gallo Decl., ¶ 29, Second Gallo Decl., ¶¶ 17-24. The court has reviewed the various affidavits and declarations and heard the statements in court regarding this, and finds these arguments to be baseless. *See,*

AGS is attempting to access the software so as to make preparations to replace Bluberi as the servicer under the Service Agreements. This is because the Definitive Agreement and the Service Agreement have different expirations. As noted above, the stated intent of the Definitive Agreement is to grant AGS a "perpetual license." As such, the Definitive Agreement does not have a predetermined termination date but does have, as is also noted above, early termination provisions. As amended, however, the Service Agreement expired on July 16, 2016. <u>AGS LLC's Exhibits</u>, Ex. 2.

No party legitimately claims that AGS does not have a right to cease using Bluberi to service the software. The mere fact that the Service Agreement has an expiration date stands clearly for the proposition that, unlike the Definitive Agreement, it is not intended to be perpetual. But nothing in the Definitive Agreement, the Indemnity Agreement or the Service Agreement contracts for what would happen should that occur. The manner in which the software is accessed under the Definitive Agreement is clear, and fails to address these circumstances.[19] As a result, when AGS demanded the software from BMM and Bluberi instructed BMM to refuse, BMM rightfully chose to preserve the *status quo* until ordered otherwise by the court.[20]

As the Definitive Agreement is not helpful, the right on which AGS now rests its argument is embodied in the Indemnity Agreement. The Indemnity Agreement states, in pertinent part, as follows:

> Licensee shall have the right at any time during the term of this Agreement to retrieve the Games Escrow Materials from the Agent within one (1) business day of Licensee's notification to Agent of the intention to retrieve said Games Escrow Materials, which may be in whole or in part.

<u>Indemnity Agreement</u>, § 1.4.

---

*e.g.*, <u>Second Gallo Decl.</u>, ¶¶ 16 (where AGS admits that the conditions for access under the Definitive Agreement have not been met). Nothing provided by AGS convinces the court that any software maintenance issue that may have arisen was not dealt with by Bluberi in accordance with the applicable contracts. Because AGS no longer appears to stand on this argument, the court will make no further inquiry in this regard.

[19]   This matching of a service agreement and source code escrow for a set term with a license, perpetual or otherwise, does not appear to be unusual in the world of software licensing. *See, e.g.*, L. Mikalonis, *Drafting Effective Software License Agreements*, *in* INTELLECTUAL PROPERTY LICENSING STRATEGIES (Aspatore 2013 Edition).

[20]   In doing so, in an email dated March 17, 2016, counsel for BMM stated to the parties, from its limited perspective of considering the Indemnity Agreement only, as follows:

> It appears that under Section 1.4 of the Indemnity Agreement, AGS is entitled to retrieve the Games Escrow Materials simply by giving notice of its intent to do so. The Indemnity Agreement does not instruct BMM to review the Definitive Agreement in determining whether to allow AGS to retrieve the Games Escrow Materials. Therefore, whether AGS giving such notice was in violation of the Definitive Agreement is not for BMM to consider. …. [I]t it appears that [under the Indemnity Agreement,] AGS is entitled to retrieve the Games Escrow Materials.

<u>Holley Decl.</u>, Ex. 8. AGS chose, however, to not release the source code, deferring to the court to consider the Indemnity Agreement in the broader context of the Definitive Agreement.

This, as the court noted at the Hearing, flies in the face of the express provisions contained in the Definitive Agreement and the structure and use of licenses. In light of the foregoing, the contract interpretation question is anything but simple. Before considering that, however, the court must first consider the statutory framework within which this dispute arises.

B.     Section 1522

Finding no case law on point, the court is left to work through the issues from the ground up. And that begins with the statute, and as with any request to the court, the court must not only establish its jurisdiction and constitutional authority, but also its specific authority to act as requested.

Were this not a case under chapter 15 of the Bankruptcy Code, the court's authority would be less clear. True, section 365(n)(4) places, under the conditions set forth therein, affirmative duties on a debtor (or trustee). But it provides no remedy for failure to comply with these provisions. Ordinarily, when the Bankruptcy Code places a duty on a party but affords no remedy directly in relation thereto, one must look to other provisions of the Bankruptcy Code for relief. Section 521 of the Bankruptcy Code, for example, places a number of duties on debtors. *See, e.g.*, 11 U.S.C. § 521(a)-(c). The remedy for failure to comply with such duties is not an order compelling compliance, it is dismissal. 11 U.S.C. § 521(i).

There is no clear remedy, however, for failure to comply with section 365(n)(4). Were this not a case under chapter, perhaps section 105 could fill the gaps, perhaps not. *See* 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *In re Caesars Entm't Operating Co., Inc.*, 808 F.3d 1186, 1188 (7th Cir. 2015) (section 105 "grants the extensive equitable powers that bankruptcy courts need in order to be able to perform their statutory duties").

But this is a case under chapter 15. And, as noted above, section 365 applies only pursuant to the Recognition Order entered, in this regard, under section 1521. 11 U.S.C. § 1521(a)(7). And because this court has granted relief under section 1521, the protections afforded creditors under section 1522 apply. It appears, therefore, that AGS's request may properly fall within the court's authority under either section 1522(b) or (c), and neither the Foreign Representative nor Callidus has argued otherwise. The court will, as previously determined, continue under the presumption that the order compelling requirement with section 365(n)(4) requested by AGS is within the court's authority. *Cf. In re Qimonda AG Bankr. Litig.*, 433 B.R. 547, 557 (E.D. Va. 2010) *and In re Tri-Continental Exchange Ltd.*, 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006).

Such an order, of course, must be justified under the terms of section 365(n), which the court turns to next.

C.     Section 365(n)(4)

Section 365 of the Bankruptcy Code addresses a debtor's contractual relationships, providing, on the one hand, rules governing the debtor's behavior with respect to such contracts and contract counterparties, and, on the other hand, protections in favor of such counterparties. Such protections exist to curtail abuse, and are especially needed where the existence of a bankruptcy case

and the other provisions of section 365 upset the balance of contract rights otherwise established by nonbankruptcy law.

Nowhere is those protections more necessary, and concomitantly the opportunity for abuse so great, but where the contracts in question are intellectual property licenses. Because such licenses are governed by a patchwork of federal and state statutory and common law, intellectual property licenses are difficult to interpret. Nonetheless, the Bankruptcy Code as originally enacted failed to consider their special nature, subjecting them instead to a debtor's general power to assume and reject executory contracts under section 365(a). The courts' approval of the use of that power, even when tempered by a condition of good faith, caused Congress to rethink this approach. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc. (In re Richmond Metal Finishers, Inc.)*, 756 F.2d 1043, 1048 (4th Cir. 1985) (noting that Congress chose to give special treatment to collective bargaining agreements but not intellectual property licenses, thus subjecting such licenses to "the general hazards created by § 365 for all business entities dealing with potential bankrupts in the respects at issue here."). The court in *Lubrizol* recognized the policy concerns to the contrary, but chose instead to interpret the law as drafted. *Id.*

*Lubrizol* and cases like it stirred Congress to act. *See* R. Meisler *et al.*, *Rejection of Intellectual Property License Agreements under Section 365(n) of the Bankruptcy Code: Still Hazy After All These Years*, 19 J. BANKR. L. & PRAC. 2 Art. 4 (2010). The result was section 365(n), which preserves much of the nonbankruptcy law rights of the parties even where the debtor has exercised its rights under section 365(a) to reject the license. *Id.*; 11 U.S.C. § 362(n)(1)-(3).

Section 365(n)(4) complements these provisions, by protecting the nondebtor party's rights under such intellectual property licenses *before* rejection. It states as follows:

> (n)(4) Unless and until the trustee rejects such contract, on the written request of the licensee the trustee shall—
>
>> (A) to the extent provided in such contract or any agreement supplementary to such contract—
>>
>>> (i) perform such contract; or
>>>
>>> (ii) provide to the licensee such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law) held by the trustee; and
>>
>> (B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment), including any right to obtain such intellectual property (or such embodiment) from another entity.

11 U.S.C. § 365(n).

Despite the important function section 365(n)(4) would appear to serve, there appear to be no published cases interpreting its provisions.[21] Even in the absence of such law, however, there are certain aspects of section 365(n)(4) that are clear: (a) section 365(n)(4) is intended to apply to "executory contract[s] under which the debtor is a licensor of a right to intellectual property";[22] (b) per its express terms, section 365(n)(4) applies prior to the rejection of such intellectual property contract; and (c) section 365(n)(4) affords no greater right to any party than that provided for "provided in such contract, or any agreement supplementary to such contract." 11 U.S.C. § 365(n)(4)(A) & (B).

As to the first aspect, though AGS is the movant, it has done little in the Motion to directly address its burden in this regard.[23] AGS addresses the meaning and essential nature of section 365(n)(4), but never directly states that the Definitive Agreement is an "executory contract under which the debtor is a licensor of a right to intellectual property." However, upon independent inquiry, there is little question that the Definitive Agreement qualifies as an "executory contract under which the debtor is a licensor of a right to intellectual property." Neither party challenges this, and a review of the two Gallo declarations is sufficient for the court to conclude that it is satisfied.[24]

---

[21]    AGS directs the court's attention to the unpublished decision *In re Particle Drilling Tech.*, Case Nos. 09-33744, 09-33830, 2009 WL 2382030, at *4 (Bankr. S.D. Tex. July 29, 2009). *Particle Drilling* does not, however, contrary to AGS's contention, address section 365(n)(4) in a substantive manner. Instead, the court there simply accepts the uncontested assertions of the movant, *id.* at *4-5, as this court does has done with various points before in this discussion.

[22]    Section 365(n)(4) references "such contract," and though section 365(n) has no introductory paragraph to which this might refer, section 365(n)(1) contains the phrase to which this must, pursuant to *noscitur a sociis*, refer. *See* 11 U.S.C. § 365(n)(1) & (4); *Commodity Futures Trading Comm'n v. Worth Bullion Grp., Inc.*, 717 F.3d 545, 549 (7th Cir. 2013) (Under the doctrine of *noscitur a sociis*, "the meaning of questionable words or phrases in a statute may be ascertained by reference to the meaning of words or phrases associated with it.").

[23]    In every matter before the court, regardless of what burdens may apply after, the movant bears the initial burden of demonstrating that it at least has a colorable claim to the relief it is requesting. *See, e.g., In re Woods*, 517 B.R. 106, 116 (Bankr. N.D. Ill. 2014) (Barnes, J.). And that burden cannot be met by simply inundating the court with information with the hope that the court will discern what the movant has failed to state outright. *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) ("Judges are not like pigs, hunting for truffles buried in briefs.").

[24]    It should be noted that AGS's failures in this regard could have been, had Bluberi chosen to contest the issue, outcome determinative. Section 365(n) applies first and foremost to "executory contract[s] under which the debtor is a licensor of a right to intellectual property." 11 U.S.C. § 365(n)(1). While section 365(n)(4)(A) & (B) expand the inquiry to include "agreement[s] supplementary to such contract," it is not the executory nature of the intellectual property license itself that is essential. Here, while the Indemnity Agreement upon which AGS relies may be executory, there is a question as to whether the Definitive Agreement, a "perpetual, fully paid-up license," is. *See, e.g., In re Exide Techs.*, 607 F.3d 957, 963 (3d Cir. 2010), *as amended* (June 24, 2010) ("perpetual, exclusive, royalty-free license" was not executory). This, in part, may turn on the question of integration of the contracts, addressed below. But because the parties have not braced this question, the court's acceptance for these purposes that the Definitive Agreement is executory should not be construed as a ruling on the merits of the issue in this regard.

As to the second aspect, again, AGS as movant has not stated that the Definitive Agreement has not been rejected. However, as noted above, the court takes judicial notice of its own docket in this regard, *Egidi*, Case No. 93C188, 1993 WL 69146, at *2; *Brent*, 458 B.R. at 455 n.5, and rejection may only occur by way of court order. 11 U.S.C. § 365(a); *In re Federated Dep't Stores, Inc.*, 131 B.R. 808, 814 (S.D. Ohio 1991) ("Under the plain language of § 365(a) court approval is required for rejection ...."). As no such rejection has been ordered here, the second aspect is satisfied.

It is with the third aspect that the real questions lie.

Here, the relief requested by AGS – whether it be construed as the performance of a contract under section 365(n)(4)(A)(i), the providing to AGS of the intellectual property under section 365(n)(4)(A)(ii), or the ordered noninterference with a contract under section 365(n)(4)(B) – must be "provided in such contract, or any agreement supplementary to such contract." 11 U.S.C. § 365(n)(4)(A) & (B).

AGS claims that the unconditional release of the source code is called for by the Indemnity Agreement. *See* Indemnity Agreement, § 1.4 ("Licensee shall have the right at any time during the term of this Agreement to retrieve the Games Escrow Materials ..., which may be in whole or in part."). The Foreign Representative, in turn, points to the complex provisions of Section 14 of the Definitive Agreement, arguing that as these provisions have not been satisfied, no release of the source code is appropriate.

AGS's arguments, though founded in the express language of the Indemnity Agreement, fly in the face of the carefully drafted provisions of the Definitive Agreement. As noted above, software escrows such as the one at issue here are created for the express purpose of protecting the licensor's rights in the source code. *See supra* n.8. Further, attempting to circumvent the provisions of an agreement expressly for the purpose of defining the parties' rights vis-à-vis each other with the terms of another agreement extant for another more limited purpose (determining BMM's rights and obligations) runs contrary to the most basic principles of contract interpretation.

In general, contract interpretation is a matter of state law. *Hanover Ins. Co. v. N. Bldg. Co.*, 751 F.3d 788, 792 (7th Cir. 2014), *cert. denied*, 135 S. Ct. 280, *reh'g denied*, 135 S. Ct. 747 ("Rules of contract interpretation are substantive, so the Agreement must be interpreted according to state law."). Here, the Definitive Agreement is governed by New York state law, Definitive Agreement, § 16.5, and the Indemnity Agreement by Nevada state law. Indemnity Agreement, § 8.4. The Definitive Agreement was executed first, however, and it is the Definitive Agreement that exists expressly to set forth the parties' rights. It is therefore the law of New York that the court must look to in determining whether the Definitive Agreement controls.

Here, the Definitive Agreement is unambiguous. The rights to access the source code set forth in Section 14 do not allow for AGS to access the code for just any reason. Instead, AGS's access rights are limited to those expressly set forth. Those rights do not include an unfettered right of access or access for the purpose of transitioning the Service Agreement.

What then, is the effect of contrary provisions in the Indemnity Agreement? Each of the parties, for different reasons, urge the court to consider the Definitive Agreement and the Indemnity Agreement as a single, integrated contract. As one New York court has stated, under New York law, "[g]enerally, 'all contemporaneous instruments between the same parties relating to the same

subject matter are to be read together and interpreted as forming part of one and the same transaction'." *Applehead Pictures LLC v. Perelman*, 913 N.Y.S.2d 165, 172 (N.Y. App. Div. 1st 2010) (citations omitted).

This is the so-called "one contract rule" that is integral to contract interpretation. RESTATEMENT (SECOND) OF CONTRACTS, § 202(2) ("A writing is interpreted as a whole, and all writings that are part of the same transaction are interpreted together."). But this rule is not absolute, as the same New York court makes clear.

Nevertheless, "separate written agreements involving different parties, serving different purposes and not referring to each other [are] not intended to be interdependent or somehow combined to form a unitary contract". As this Court stated in *National Union*, "Manifestly, one agreement may follow from and even have as its *raison d'etre* another and yet be independently enforceable". Additionally, "in the absence of some clear indication that the parties had a contrary intention, contracts manifesting separate assents to be bound are generally presumed to be separable".

*Applehead Pictures*, 913 N.Y.S.2d at 172 (citations omitted); *see also Arciniaga v. Gen. Motors Corp.*, 460 F.3d 231, 237 (2d Cir. 2006) (setting forth the New York standard and the factors later stated in *Applehead Pictures*).

Here it is hard to conclude that the Definitive Agreement and the Indemnity Agreement are integrated. They have several of the criteria the *Applehead Pictures* court noted: different parties, different purposes and the Definitive Agreement fails to reference the Indemnity Agreement (though a version of the Indemnity Agreement was, as noted above, included as an exhibit to the Definitive Agreement). True, the Indemnity Agreement follows from and has its *raison d'etre* arising out of the Definitive Agreement, but it is, as BMM correctly points out, independently enforceable. *See supra* n.20.

Given that the Definitive Agreement restricts AGS's rights and Bluberi has a right thereunder to enforce those restrictions, were the contracts not integrated but separately enforceable, AGS would have to demonstrate that the Indemnity Agreement somehow modified the provisions of the Definitive Agreement relating to the source code escrow.[25] Under New York law, that modification, whether it be simply an amendment or something more akin to novation, rescission or supersession, must be product of the parties' clear intent. *Northville Indus. Corp. v. Fort Neck Oil Terminals Corp.*, 474 N.Y.S.2d 122, 125 (N.Y. App. Div. 2d 1984). The manifestation of that clear intent be express or implied. *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 27-28 (2d Cir. 2015) (aggregating New York cases). But nothing in the Indemnity Agreement expresses an intent to do so, much less a clear intent, and AGS has made no showing in that regard.

Such a showing would be even more difficult in light of the literal purposes of the two agreements – one expressly for the purpose of defining the parties' rights vis-à-vis each other and

---

[25]    A tortured reading of section 365(n)(4) might lead a party to argue that it need not reconcile the two. As the Indemnity Agreement, in such an instance, would be an agreement supplementary to the Definitive Agreement, arguably it's provisions could be enforced without reference to the Definitive Agreement. *See* 11 U.S.C. § 365(n)(4). That clearly could not have been Congress's intent and, thankfully, AGS does not advance such an argument here.

one expressly for the more limited purpose of determining a third party's obligations. *See, e.g.,
Matterhorn, Inc. v. NCR Corp.*, 763 F.2d 866, 871-2 (7th Cir. 1985) (addressing the question of whether
a subsequent contract superseded a "universal" agreement between the parties). Last, given the fact
that a version of the Indemnity Agreement containing what appears to be this same provision
existed as an exhibit to the Definitive Agreement, the parties must have intended the Indemnity
Agreement to coexist with the Definitive Agreement, not act as a modification to it.

Given that the Definitive Agreement and the Indemnity Agreement do not appear to be
integrated and there exists no clear manifestation of the parties' intent, express or implied, to modify
the Definitive Agreement, the Definitive Agreement's provisions still apply and AGS may not access
the source code except under the conditions set forth in the Definitive Agreement. Nothing
convinces the court that those conditions exists, or if they exist, that Bluberi has not addressed them
in the manner set forth in the Definitive Agreement. As a result, there is no contractual right for
AGS to invoke when seeking the protection of section 365(n)(4). Section 365(n)(4) does not apply.

It should be noted that, even if the court were to consider the contracts to be integrated, the
result would be the same. Had that been the case, the court would be faced with reconciling
conflicting provisions within a single contract. In such an instance, canons of contract of
interpretation would come into play. Pursuant to those canons, the court would attempt to give all
provisions of the contract meaning without rendering any provision superfluous. *Int'l Multifoods
Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 86 (2d Cir. 2002) (setting forth standard under New
York law); *see also Young v. Verizon's Bell Atl. Cash Balance Plan*, 615 F.3d 808, 823 (7th Cir. 2010). In
so doing, the specific provisions would generally be given effect over the general ones. *In re Arcapita
Bank B.S.C.(c)*, 520 B.R. 15, 26 (Bankr. S.D.N.Y. 2014) (setting forth standard under New York law);
*see also Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 227 (7th Cir. 1993). Further, the
court would consider the broader context in which provisions exist. *In re Sept. 11 Litig.*, 906 F. Supp.
2d 295, 304 (S.D.N.Y. 2012) (setting forth standard under New York law), *aff'd sub nom. World Trade
Ctr. Properties LLC v. QBE Int'l Ins. Ltd.*, 627 F. App'x 10 (2d Cir. 2015); *see also In re Airadigm
Comme'ns, Inc.*, 616 F.3d 642, 664 (7th Cir. 2010).

None of these factors favor AGS's interpretation. AGS's expansive reading of the
Indemnity Agreement renders most of Section 14 of the Definitive Agreement superfluous. Yet
Section 14 of the Definitive Agreement is very specifically drafted, unlike the more general
provisions of the Indemnity Agreement. AGS's reading makes the entire transaction different than
it clearly was intended to be. AGS would have the transaction be a sale of the source code, rather
than a license of the object code. Allowing AGS unfettered access to the source code runs contrary
to what the parties clearly intended.

Finally, considering the broader context of what transpired and affording each provision
meaning results in the inevitable conclusion that each agreement does what it is intended to do. The
Definitive Agreement sets forth the rights between AGS and Bluberi. The Indemnity Agreement,
whether it be a true indemnity agreement or a disguised escrow agreement, sets forth the obligations
of BMM as the escrow agent. It would be perfectly understandable that BMM would be
indemnified for a broader set of circumstances than the Definitive Agreement actually allowed. This
is the nature of indemnifications – they tend to overprotect the indemnified party, not under. Thus
circumstances might exist where AGS's demand from BMM may be correctly complied with by
BMM under the Indemnity Agreement while such demand nonetheless be contractually unsound
under the Definitive Agreement. Such is the case here.

Thus in either instance, integrated or not, the conclusion remains the same. Section 365(n)(4) requires a contractual provision upon which to rest, and there is no contractual provision here for AGS to seek enforcement of.

## CONCLUSION

The discussion herein began with an observation that the contracts in question are poorly drafted. That conclusion has not changed. The drafting of and interplay between the contracts here does not support the rights claimed by the licensee. In order for there to be a contractual right enforceable under section 365(n)(4), there must first be a right "provided in such contract, or any agreement supplementary to such contract." 11 U.S.C. § 365(n)(4)(A) & (B). Here, there is no right such as that claimed by AGS and there is, therefore, no right to relief under section 365(n)(4).

For the foregoing reasons, the court concludes that the Motion should and will be DENIED. A separate order resolving the Motion to that effect will be issued concurrent with this Memorandum Decision.

Dated: August 4, 2016                          ENTERED:

_____
Timothy A. Barnes
United States Bankruptcy Judge